UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Amanda Mathis, | ) | C/A No. 5:13-1424-DCN-KDW |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| vs. | ) | REPORT AND RECOMMENDATION |
| | ) | OF MAGISTRATE JUDGE |
| Carolyn W. Colvin, Acting Commissioner | ) | |
| of Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civil Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") pursuant to the Social Security Act ("the Act"). The issues before the court are whether the Commissioner's findings are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded for further administrative action.

I.    Relevant Background

    A.    Procedural History

On October 1, 2009, Plaintiff protectively applied for DIB and SSI under Titles II and XVI of the Act, 42 U.S.C. §§ 401-433, 1381-1383c. Tr. 124-37. She alleged a disability onset date of August 21, 2009. Tr. 126. Plaintiff's applications were denied initially and upon reconsideration, Tr. 103-06, and Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), Tr. 118-19. The administrative hearing was held on May 4, 2011, Tr. 51-101, and

on July 15, 2011, the ALJ issued an unfavorable decision, finding Plaintiff not disabled within the meaning of the Act, Tr. 14-23. The Appeals Council denied Plaintiff's request for review. Tr. 1-5. Thus, the ALJ's decision became final and this case is ripe for judicial review pursuant to 42 U.S.C. § 405(g). Plaintiff brought this action seeking judicial review of the Commissioner's decision in a Complaint filed on May 24, 2013. ECF No. 1.

B.     Plaintiff's Background

Plaintiff was born on November 28, 1979, and was 29 years old as of her alleged onset date of August 21, 2009. Tr. 152.  Plaintiff completed high school, Tr. 164, and her past relevant work ("PRW") included retail store cashier, manufacturing shrink wrapper, and hospital unit secretary, Tr. 158. Plaintiff claimed the illnesses and conditions that limit her ability to work are migraines, neck/back pain, heart defect, fibromyalgia, depression, postural orthostatic tachycardia syndrome, and worsening conditions following a March 2009 car accident. Tr. 157.

C.     The Administrative Proceedings

1.     Plaintiff's Hearing Testimony

Plaintiff was 31 years old at the time of her hearing, and testified that she was five-foot-seven-inches tall, weighed 310 pounds, and was right-handed. Tr. 55. Plaintiff testified that she was divorced, but lived with her two children, ages three and five, and her common-law husband in a government apartment. Tr. 55-56. She stated her common-law husband, who paid their bills, was disabled, and her ex-husband had not paid child support since January. Tr. 56. Plaintiff testified that she last worked on August 21, 2009, and at that time she was employed at Greenville Children's Hospital as a unit secretary where she had been for ten months. Tr. 59. Plaintiff stated she stopped working because her "physical health had gotten so bad, [she] was told either [she] quit work or the doctors would no longer treat [her]." *Id.* Plaintiff stated since that time she has been incapable of working. Tr. 60. Plaintiff described her past work history,

which included working at Oconee Medical Center as a nursing assistant and unit secretary from 2000 until 2008. *Id.* Plaintiff stated she left that job to work for a doctor's office. *Id.* She worked at the doctor's office for six months and left in 2008 when she was put on bed rest due to preterm labor. Tr. 61. She was laid off from the job at the doctor's office because she was unable to return to work within six months. *Id.* When she was able to work again she was employed by Greenville Children's Hospital. *Id.*

Plaintiff testified that she wakes up between 7:00 and 8:00 a.m., and will get out of bed when her children wake up. Tr. 62. She stated that they usually have a quick breakfast, and then she sits on the couch where she reads, watches television, and naps. *Id.* Plaintiff stated that she does not read for long because she will "end up getting a headache from the reading." *Id.* Plaintiff stated that she does not belong to any clubs or organizations, and although she used to attend church regularly, she had gone "maybe once in the last two years." Tr. 63. Plaintiff testified that she does not visit family or friends, but her mother visits about twice a week to spend time with the children and "take care of them, some." *Id.* Plaintiff stated that she had a computer that she used mainly for gaming. Tr. 63-64. Plaintiff testified that she spent 15 minutes at a time, twice a day, on the computer. Tr. 64.

Plaintiff stated she cannot cook, and she and her husband usually prepare microwave meals or something that can be prepared quickly. Tr. 64. She testified that her husband does most of the laundry, but her mother helps. *Id.* Her husband also does the dishes, although Plaintiff testified that he has permanent nerve damage in his back and his legs go numb. *Id.* Plaintiff stated that he also changes the beds, but she tries to help as much as she can. Tr. 65. Plaintiff testified that she cannot vacuum, sweep, or mop. *Id.* She stated that her husband does those chores "on occasion" but they have friends who come over and help. *Id.* Plaintiff stated that her husband does the grocery shopping because she cannot do any bending and lifting, and she also

has seizures throughout the day. *Id.* Plaintiff testified that she has daily "focal and petit mal seizures" but does not know when she started having them, does not know if she had them when she was working, and they have been witnessed only by her husband and children. Tr. 66-68. Plaintiff stated that she was not allowed to drive because of the seizures, and doctors were "in the process of pulling [her] driver's license." Tr. 66. Plaintiff testified that she had "not driven hardly any in the last two years at all." Tr. 68.

Plaintiff testified that she does not do any yard work or gardening because she cannot bend over or get on her hands and knees. Tr. 68. She stated that in the past five years she has gained about 25-to-30 pounds, but was told by Dr. Baxley that even with losing weight, her disability would be permanent. *Id.* Plaintiff stated that she used to paint, but she only paints on occasion because she is "so shaky." Tr. 69. Plaintiff testified that the reason she is unable to work is because of the seizures and migraines. Tr. 69-70. Plaintiff stated she has migraines weekly that last two-to-three days, but she has had them last up to ten days. Tr. 70. She takes injections of Toradol at home for the migraines, but also takes Lortab first, and uses the Toradol injection as her "last resort." *Id.* Plaintiff testified that sometimes she remains in bed because of the migraines, and she has "a lot of nausea and vomiting with [her] migraines." Tr. 71. She also stated she cannot tolerate light or sound. *Id.* Plaintiff testified that she also has mechanical neck and back pain that was caused by an automobile accident in March of 2009. *Id.* She takes Lortab to help with that pain. *Id.* Plaintiff stated that through an MRI doctors discovered she has a syrinx.[1] *Id.* She defined it as affecting her spinal cord and the flow of spinal fluid. Tr. 72.

---

[1] Syringomyelia is a rare disorder in which a cyst forms within your spinal cord. As the cyst, which is called a syrinx, expands and lengthens over time, it compresses and damages part of your spinal cord from its center outward. Damage to the spinal cord caused by a syrinx can cause symptoms like progressive pain, stiffness, and weakness in the back, shoulders, arms, and legs. Individuals with the disorder might lose the ability to feel cold and pain normally. Some people with this disorder will not have any symptoms and will not need treatment. For others,

Plaintiff stated that Dr. Baxley told her that if it progresses she will need surgery or she will be paralyzed. *Id.* Plaintiff stated that Dr. Baxley also diagnosed her with fibromyalgia, which Plaintiff believes was triggered by the automobile accident. *Id.* She takes Flexeril and Cymbalta for the fibromyalgia. *Id.* Plaintiff testified that she has depression, which she has had since high school, but she is able to manage it with medication including Cymbalta and Xanax. Tr. 73. Plaintiff stated she has "a lot of trouble with anxiety." Tr. 74.  She stated that she gets "really nervous" and cannot stand being in large crowds or groups of people, and she does not handle pressure or authority very well. *Id.* Plaintiff testified that she usually could only sit for 15-to-20 minutes before she would need to stand. *Id.* She stated that if she sat with her feet down, her feet "turn completely purple." *Id.* Plaintiff testified she could stand in one position for about two-to-five minutes—depending on the shoes she was wearing. Tr. 75. She stated she could walk about 100-to-150 feet before her back started hurting. *Id.* Plaintiff testified that she was unable to lift or carry objects, but stated that before her accident she was able to lift her child. Tr. 75-76. Plaintiff testified that she is unable to bend over, but if she has to bend she starts "hurting really, really bad." Tr. 76. Plaintiff stated she "cannot do stairs" but if faced with stairs she climbs them very slowly. *Id.* Plaintiff testified that her medications make her drowsy. *Id.* Plaintiff stated Dr. Baxley had an EMG run in 2009 that showed she had carpal tunnel in her left arm, and Plaintiff was wearing a brace. Tr. 76-77. Although she was right-handed, Plaintiff testified that she used her left hand "the most when [she] was at work." Tr. 77. She stated she used her left hand to look through the charts, and her right hand for the computer. *Id.*

Upon questioning by her attorney, Plaintiff testified that she has a heart birth defect, and has had three surgeries to help with heart rhythm problems. Tr. 78. Plaintiff stated the last two

---

syringomyelia will cause symptoms and complications that worsen as the syrinx expands. *See* http://www.healthline.com/health/syringomyelia#Overview1 (last visited June 27, 2014).

ablations[2] were successful, but she still has problems with arrhythmias. Tr. 79. Plaintiff also stated she had tachycardia, which was part of the reason for the ablations. *Id.* She stated the main reason for the ablations was because she "kept going into SVP."[3] *Id.* Plaintiff also testified about her history of seizures. She stated that she had convulsive seizures as a child, but she grew out of them and doctors were able to take her off the seizure medication. Tr. 80. Plaintiff stated that she spoke with Dr. Baxley the day before the hearing regarding her March 2009 car accident, and that he told her she had seizures during that time period. Tr. 80-82. Plaintiff stated that she did not discuss the seizures initially because she "was having such significant issues with [her] migraines." Tr. 82. She testified that she had migraine headaches since high school, but they became uncontrollable after her 2009 car accident. *Id.* She stated that she began seeing Dr. Baxley in 2008 for the migraines and "spent all but a hundred days in 2010 in the hospital." *Id.* Plaintiff stated that she was hospitalized for endocarditis[4] but that issue has been resolved. Tr. 83. Plaintiff testified that Dr. Baxley tested her for seizures in January 2011 and that she had a positive electroencephalogram showing the tendency toward partial seizures. Tr. 84. Plaintiff confirmed that Dr. Baxley stated the tendency for partial seizures would preclude her from gainful employment. *Id.* Plaintiff stated that because of her migraines Dr. Baxley had advised her not to drive, but as of January 2011, Dr. Baxley prohibited her entirely from driving. Tr. 85.

---

[2] Catheter ablation is a procedure used to selectively destroy areas of the heart that are causing a heart rhythm problem. Thin, flexible wires called catheters are inserted into a vein, typically in the groin or neck. They are threaded up through the vein and into the heart. There is an electrode at the tip of each wire. The electrode sends out radio waves that create heat. This heat destroys the heart tissue that causes the fast heart rate. *See* http://www.webmd.com/heart-disease/catheter-ablation-for-a-fast-heart-rate (last visited June 24, 2014).

[3] Based on her treatment records, Tr. 320, Plaintiff likely meant "SVT" or supraventricular tachycardia, which can be treated with catheter ablation. SVT "means that from time to time your heart beats very fast for a reason other than exercise, high fever, or stress." *See* http://www.webmd.com/heart-disease/tc/ supraventricular-tachycardia-overview (last visited June 24, 2014).

[4] Endocarditis is an infection of the inner lining of the heart chambers and valves. *See* http://www.nhlbi.nih.gov/health/health-topics/topics/endo/ (last visited June 24, 2014).

Plaintiff testified that she has focal seizures during which her eyes are open but she cannot see, hear, talk, or remember anything. Tr. 85-86. She stated that she has at least one focal seizure a day and they have been observed by her husband or children. Tr. 86. She stated that due to the frequency of her seizures and migraines, Dr. Baxley advised her not to be left alone or left alone with her children. Tr. 86. Plaintiff testified that in 2010 her children spent most of their time with family members. Tr. 87.

Plaintiff also testified about the medications she was currently taking as listed in Exhibit 28F of the medical records. She stated that Benadryl helps decrease facial pain and pressure from the migraines, she takes Xanax twice a day which "can make [her] drowsy," she takes Metoprolol for her heart, Atrovent as needed for her asthma, Naprosyn for pain, Pepcid twice daily, Phenergan for nausea with migraines, Lortabs as needed, Lasix for swelling in her ankle, Cymbalta for depression and fibromyalgia, Flexeril for fibromyalgia and back spasms, Lopid to lower her triglycerides, Ambien to help her sleep, and Stadol nose spray for her migraines. Tr. 87-91. Plaintiff stated that if she takes the Stadol she has to lie down because it causes "a lot of drowsiness." Tr. 91. When asked whether she thought she would be able to work an eight-hour day someplace where she could sit or stand and move around some, Plaintiff stated she would be unable to do so because she has "a lot of trouble concentrating . . . especially with the black outs and spacing out." Tr. 93. Plaintiff testified that it takes her five-to-ten minutes to recover from a focal seizure. *Id.*

### 2. Vocational Expert ("VE") Testimony

Dr. Vincent Hecker testified as the VE at Plaintiff's administrative hearing, and described Plaintiff's PRW as unit secretary as sedentary, with a specific vocational preparation ("SVP") of six, performed as "up to medium." Tr. 96. Her work in a medical physician's office was also classified as sedentary, SVP of six. *Id.* The ALJ asked the VE to consider a person of Plaintiff's

age, education, and work experience with the ability to do sedentary work with the following limitations: the ability to sit/stand, change positions; never climb ladders, but could occasionally perform all the other postural limitations; avoid concentrated exposure to vibrations and hazards. *Id.* The ALJ asked if such a person could do Plaintiff's prior work, and the VE responded not as Plaintiff performed the jobs, but the individual could perform them as normally or generally performed in the economy. Tr. 97. The VE testified there were "[l]ots of transferrable skills." *Id.* Those skills included primarily office practices and procedures, keyboarding with record keeping, reading, writing, counting at high levels, and understanding medical terminology. Tr. 98. The VE testified that there were three or four million clerical jobs available in the national economy and six or seven thousand jobs in South Carolina. *Id.*

Plaintiff's attorney asked if a person could continue a job as a secretary if subject to daily focal or petit mal seizures with loss of consciousness from ten-to-30 minutes that required five to ten minutes recovery time, severe to moderately severe pain from migraine headaches worsening on exertion, and who required two additional rest periods in addition to the regular breaks in an eight-hour work day. Tr. 99-100. The VE testified there would be no work available. Tr. 100.

## II. Discussion

### A. The ALJ's Findings

In her July 15, 2011 decision, the ALJ made the following findings of fact and conclusions of law:

1.   The claimant meets the insured status requirements of the Social Security Act through September 30, 2014.

2.   The claimant has not engaged in substantial gainful activity since August 21, 2009, the alleged onset date (20 CFR 404.1571 *et seq.,* and 416.971 *et seq.*).

3.   The claimant has the following severe impairments: mechanical neck and back pain status post motor vehicle accident; obesity; seizures; migraine

headaches; and history of tachycardia (20 CFR 404.1520(c) and 416.920(c)).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a). The claimant would need to be able to sit or stand and change positions. She should never climb ladders. She can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. She should avoid concentrated exposure to vibrations and hazards.

6.      The claimant is capable of performing past relevant work as a unit secretary and as a worker in a physician's office as generally performed. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7.      The claimant has not been under a disability, as defined in the Social Security Act, from August 21, 2009, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

Tr. 16-22.

B.  Legal Framework

1.      The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for

benefits, who are not of retirement age, who properly apply, and who are "under a disability,"

defined as:

inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]

42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is working; (2) whether the claimant has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[4] (4) whether such impairment prevents claimant from performing PRW; and (5) whether the impairment prevents the claimant from performing specific jobs that exist in significant numbers in the national economy. *See* 20 C.F.R. § 404.1520, § 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) and § 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); § 416.920(a), (b); Social Security Ruling ("SSR") 82–62

---

[4]The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii); § 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; § 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

(1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act.  42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981)*; see generally Bowen*, 482 U.S. at 146, n.5 (regarding burdens of proof).

2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner made after a hearing to which he was a party."  42 U.S.C. § 405(g).  The scope of that federal court review is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case.  *See id.*,  *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (citing *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence."  *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence.  "Substantial evidence" is "such relevant evidence as a reasonable mind might accept

11

as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings, and that his conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

C.    Analysis

1.    RFC Assessment

a.    Plaintiff's Migraine Headaches

Plaintiff asserts that the "ALJ failed to properly evaluate [Plaintiff's] migraine headaches when formulating her RFC." Pl.'s Br. 21, ECF No. 16. The Commissioner argues that "the ALJ properly assessed Plaintiff's residual functional capacity." Def.'s Br. 13, ECF No. 20.

Social Security Ruling 96-8p, 1996 WL 374184, at *7, provides:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

Further, "[t]he RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." *Id.*

In making her RFC assessment, the ALJ noted that she gave Plaintiff's "testimony regarding physical concerns some benefit of the doubt" and limited Plaintiff to sedentary work as defined in the regulations. Tr. 21. The ALJ further noted that Plaintiff "should also avoid concentrated exposure to vibrations, since this could potentially aggravate her reported ongoing issues with migraines." Tr. 22. Discussing Plaintiff's migraine headaches, the ALJ noted:

> The claimant has reportedly had migraine headaches since the age of 18 as well. (Exhibit No. 16E). The treatment record reflects the claimant providing that she has two to three headaches a week. However, the claimant has also indicated that her headaches were not as severe with medication. (Exhibit No. 4F/4).
> . . . .
> . . . She indicated that she has migraines and seizures multiple times throughout the course of a typical week. However, the medical evidence does not document this level of frequency. In this respect, the undersigned notes that the claimant has reportedly had seizures and migraines for years and was able to maintain consistent earnings despite these conditions. It is further noted that a treatment note from December of 2010 shows the claimant reporting that Lortab no longer helps her. (Exhibit 28F/4). Yet, she still takes this medication.

Tr. 20.

Plaintiff argues that the ALJ's reliance on one medical report that indicated Plaintiff obtained some relief from migraine headache pain with medication minimizes the impact of her migraines and does not take into consideration numerous medical reports indicating the continued frequency and intensity of her migraines. Pl.'s Br. 22-23.

The ALJ cited to one medical treatment record that indicated Plaintiff obtained relief from her migraines with medication. That report of Dr. Baxley, dated August 13, 2009, read:

> The patient presents today for a follow-up for her migraine headaches and mechanical neck and back pain. She states she continues to have 2 to 3 migraine headaches a week; however, they are not quite as severe since she has started on some p.r.n. Xanax for anxiety. She states that if she catches the migraine early on, she is able to abort it before it becomes severe.

Tr. 333.

As Plaintiff noted in her Brief, subsequent treatment records indicate Plaintiff's headaches became worse and were unimproved with medication. Pl.'s Br. 22 (citing Tr. 331, 440-41, 444-45, 468-72, 654-59, 705-11, 712-18, 719-24, and 750-755). Plaintiff asserts the "ALJ's reliance on 'relief with medication' does not adequately account for the continued problems reflected in the record, and the ALJ has failed to provide any explanation showing why she would have rejected this evidence." *Id.* at 23. The Commissioner counters that, although Plaintiff's headaches were not eliminated entirely with medication, "the fact that they were admittedly controlled was properly considered by the ALJ" and supports her RFC finding. Def.'s Br. 15. The undersigned agrees with Plaintiff. A single treatment note indicating Plaintiff's migraines were "not quite as severe" with Xanax does not demonstrate control, especially in the face of the subsequent medical records showing multiple treatments for migraines including injections, multiple-drug combinations, and hospitalization. A July 13, 2010 treatment note indicated Dr. Baxley planned to refer Plaintiff to another doctor for her headaches noting that "[n]othing has helped them. She is unimproved." Tr. 440. The ALJ did not explain, as required by SSR 96-8p, how she "considered and resolved" these material inconsistencies.

Plaintiff also asserts the ALJ's finding that the medical evidence does not document the level of alleged frequency of her headaches is erroneous. *Id.* at 23. She further asserts that the ALJ's minimization of the impact of her migraine headaches on her RFC based on Plaintiff's ability to work prior to her alleged onset date does not take into account the medical evidence indicating her headaches "worsened in severity near the alleged onset date." *Id.* at 24. The Commissioner does not dispute that the medical evidence supports the alleged frequency of Plaintiff's migraines, but notes that at the hearing Plaintiff stated she had headaches every week lasting for days at a time. Def.'s Br. 15. The Commissioner notes it "is not entirely clear" whether the ALJ's finding regarding frequency is based on the documented reports of migraines,

or on the multiple migraines and seizures combined. The Commissioner argues that "[e]ither way, both statements are supported by the record, and the ALJ should not be penalized for a poorly-worded sentence when both interpretations hold true." *Id.* The Commissioner also argues that even if the evidence shows Plaintiff's migraines increased in frequency, it does not show they increased in severity, and therefore, it was appropriate for the ALJ to note that Plaintiff had worked for many years despite her migraines and seizures. *Id.* at 15-16.

Given that the record supports the alleged frequency of Plaintiff's migraine headaches, the undersigned is unable to determine what the ALJ meant by her finding that "the medical evidence does not document this level of frequency." Tr. 20. The ALJ does not address the impact of increasing severity of Plaintiff's headaches on her ability to work after the alleged onset date. Additionally, the undersigned is unclear as to the ALJ's reference to Plaintiff's continued use of Lortab when discussing Plaintiff's migraines and seizures. The referenced treatment record indicates Plaintiff was addressing her left hand numbness and worsening low back pain when she stated that the Lortab no longer helped her. Tr. 779. The ALJ's RFC assessment is not consistent with the objective medical evidence. While this court may not reweigh the evidence or substitute its own judgment for the Commissioner's, *see Hays*, 907 F.2d at 1456, the ALJ has the duty to weigh the evidence, resolve material conflicts in the record, and decide the case accordingly. *See Perales*, 402. U.S. at 399. Based on the ALJ's narrative, the undersigned is unable to determine whether her RFC assessment is supported by substantial evidence. On remand, the ALJ should revisit her RFC assessment considering the continuing frequency and escalating severity of Plaintiff's migraine headaches.

### b.  Plaintiff's Carpal Tunnel Syndrome

Plaintiff also alleges the ALJ failed to consider Plaintiff's carpal tunnel syndrome in formulating her RFC assessment. Pl.'s Br. 24. Plaintiff notes that the Dictionary of Occupational

Titles ("DOT") states that the job of medical secretary requires "frequent" reaching, handling, and fingering and her impairment "would surely have an impact on any job, such as that of a medical secretary, that required frequent handling and fingering." *Id.* at 26. The Commissioner asserts that the "record from the period at issue evidences at most mild carpal tunnel syndrome in Plaintiff's non-dominant, left hand, without any significant limitation that should have been included in the ALJ's RFC finding." Def.'s Br. 17.

In her Step Two analysis, the ALJ acknowledges that Plaintiff has left carpal tunnel syndrome, but noted that nerve conduction findings revealed it to be mild, and therefore it was non-severe because it would not "more than minimally affect the claimant's capacity for basic work." Tr. 17. The ALJ did not address, at all, Plaintiff's carpal tunnel syndrome in her RFC analysis.

Because the undersigned recommends remand for consideration of the impact of Plaintiff's migraine headaches on the ALJ's RFC assessment, the ALJ should also consider the effect of Plaintiff's carpal tunnel syndrome.

### 2.    Consideration of Plaintiff's Impairments in Combination

Plaintiff asserts the ALJ failed to properly evaluate her carpal tunnel syndrome in combination with all of Plaintiff's impairments. Pl.'s Br. 27. The Commissioner argues that because the ALJ stated several times that she reasonably considered the entire record and all of the evidence, and she specifically indicated that she considered the combined effect of Plaintiff's impairments, the court "should take the ALJ's word that the combined effect of Plaintiff's impairments were considered and evaluated." Def.'s Br. 6.

When, as here, a claimant has more than one impairment, the statutory and regulatory scheme for making disability determinations, as interpreted by the Fourth Circuit, requires that the ALJ consider the combined effect of these impairments in determining the claimant's

disability status. *See Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989); *Lemacks v. Astrue*, No. 8:07-2438-RBH-BHH, 2008 WL 2510087 (D.S.C. May 29, 2008), *aff'd*, 2008 WL 2510040 (D.S.C. June 18, 2008).  Even if the claimant's impairment or impairments in and of themselves are not "listed impairments" that are considered disabling per se, the Commissioner must also "consider the *combined effect* of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity." 42 U.S.C. § 423(d)(2)(B) (2004) (emphasis added); *see also* 20 C.F.R. §§ 404.1523, 416.923. The ALJ must "consider the combined effect of a claimant's impairments and not fragmentize them." *Walker*, 889 F.2d at 50. "As a corollary, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments."  *Id*.

The law in the Fourth Circuit is clear: in-turn consideration of multiple impairments is insufficient. The underlying ALJ decision in *Walker* had included discussion of each of claimant's impairments separately, noting "the effect or noneffect of each." 889 F.2d at 49-50. The Fourth Circuit overturned those ALJ findings because, although the ALJ "discussed each of claimant's impairments[, he] failed to analyze the cumulative effect the impairments had on the claimant's ability to work." *Id*. at 50. Similarly, the ALJ's fragmented examination of Plaintiff's impairments in this matter is insufficient. The ALJ's declaration that "[t]he claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926[,]" Tr. 18, is insufficient under the law. *See Walker*, 889 F.2d at 50 (such a "finding in itself, however, is not sufficient to foreclose disability.").

Here, the ALJ found that Plaintiff suffered from the severe impairments of mechanical neck and back pain, obesity, seizures, migraine headaches, and history of tachycardia. Tr. 16. The ALJ also noted Plaintiff's non-severe impairments of gastrointestinal problems, asthma,

fibromyalgia, restless leg syndrome, bilateral knee pain, carpal tunnel syndrome, and depression and anxiety. Tr. 17-18.  Although the ALJ found these alleged impairments to be "non-severe," she should have considered them in combination with the severe impairments. The ALJ also should have included adequate explanation of her consideration of the combined effects of Plaintiff's severe and non-severe complaints and impairments in her decision.  *Walker*, 889 F.2d at 50.

Nowhere in her decision does the ALJ discuss how and whether she considered the combined cumulative effect of Plaintiff's impairments, and whether, together, the limitations rendered Plaintiff disabled. *See Walker*, 889 F.2d at 50 (holding ALJ must "adequately explain his or her evaluation of the combined effect of the impairments.").  Therefore, it is recommended that the decision be remanded to the ALJ so that she can examine the combined effect of all of Plaintiff's impairments, severe *and* non-severe, and, in the decision on remand, explain her evaluation of the combined effect of Plaintiff's multiple impairments to allow this court to determine whether substantial evidence supports the ALJ's decision.

3.     New Evidence Submitted to Appeals Council

Plaintiff argues that a Medical Source Statement by Dr. Baxley, dated September 12, 2011, and submitted to the Appeals Council was new evidence that might have affected the fact-finder's decision, and therefore, pursuant to *Meyer v. Astrue*, 662 F.3d 700 (4th Cir. 2011), should have been weighed. Pl.'s Br. 27. The Commissioner asserts "the Appeals Council considered Dr. Baxley's post-decision opinion, and properly determined that it would not affect the outcome of the ALJ's determination." Def.'s Br. 18-19.

In *Meyer* the Fourth Circuit addressed the difficulty that arises on review by the courts when the Appeals Council makes additional evidence part of the record for purposes of substantial evidence review, but the evidence has not been weighed by the fact finder or

reconciled with other relevant evidence. Under the facts presented in *Meyer*, the court determined that the new evidence added to the record by the Appeals Council was not "one-sided" and that, upon consideration of the record as a whole, the court could not determine whether substantial evidence supported the ALJ's denial of benefits. *Id.* at 707. In *Meyer*, the ALJ had determined that the record lacked evidence the ALJ deemed critical; the plaintiff subsequently obtained this evidence and presented it to the Appeals Council. *Id.* The Fourth Circuit concluded that "no fact finder has made any findings as to the treating physician's opinion or attempted to reconcile that evidence with the conflicting and supporting evidence in the record." *Id.* Because "[a]ssessing the probative value of competing evidence is quintessentially the role of the fact finder," the case had to be remanded to the ALJ for further fact finding. *Id.* The court noted the ALJ's suggestion that such an "evidentiary gap played a role in" the ALJ's decision and remanded the matter for additional fact finding. *Id.*

Here, the ALJ considered and weighed Dr. Baxley's earlier opinion, and noted:

> However, Dr. Baxley's opinion is not fully supported by and not fully consistent with the objective evidence of record in its entirety. Reports from Dr. Baxley's treatment notes appear to be largely based on the claimant's subjective assertions. The record lacks any substantial neurological findings to verify the level of incapacity suggested by Dr. Baxley.

Tr. 21.

Dr. Baxley's September 2011 opinion statement included his diagnosis of Plaintiff and identified her symptoms. Tr. 784. Dr. Baxley also provided an opinion regarding Plaintiff's postural and manipulative limitations. Tr. 785-89. Plaintiff asserts this information fills an "evidentiary gap" in the record because there are no other opinions of Plaintiff's functional limitations from a treating source. Pl.'s Br. 30. The Commissioner argues "the record does not support Dr. Baxley's opinion, and, therefore, it would not have affected the ALJ's decision since it would have properly been rejected had she seen it." Def.'s Br. 19.

With regard to Dr. Baxley's September 2011 opinion statement, the undersigned notes that, as far as the diagnosis and symptoms, it largely reiterates opinions expressed in Dr. Baxley's earlier treatment notes which the ALJ discounted. *Compare* Tr. 331-32, 334-35, 440, 442 444, 448, 775, *with* Tr. 784-85. However, the functional limitations, especially as they pertain to limitations related to Plaintiff's extremities, are new opinions by Dr. Baxley. Because the undersigned recommends remand for review of the ALJ's RFC assessment and analysis of combined impairments, the additional evidence submitted to the Appeals Council does raise a question as to whether the ALJ's opinion is supported by substantial evidence. Accordingly, in addition to the above-stated reasons, this case should be remanded so that the ALJ can make a finding as to the weight to be given to this new evidence from Dr. Baxley. *Wheelock v. Astrue*, No. 07-3786-HMH-BM, 2009 WL 250031, at *9 (D.S.C. Feb. 3, 2009) (remanding case to ALJ to obtain assessment of new and material evidence presented by the plaintiff to Appeals Council when Appeals Council did not specify a reason for rejecting it or explicitly indicating the weight given to that evidence).

## III. Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the undersigned cannot determine that the Commissioner's finding is supported by substantial evidence or is without legal error.

Accordingly, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions, it is recommended that the Commissioner's decision be reversed and remanded for further administrative action as detailed within.

IT IS SO RECOMMENDED.


June 30, 2014                                    Kaymani D. West
Florence, South Carolina                         United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**